237. Mr. James. Thank you, Your Honor. May it please the Court, my name is Craig James. I represent Michael Nunn, the petitioner in this matter. I want to touch on two issues that I think are central to this petition for review. First, we believe, as suggested in the briefs, that the Administrative Judge did not analyze the facts presented to him under the Court's most recent decision in Crowley last year. And that, I suggest, is the basis for a reversal at this point. However, having said that, I'd like to talk for a moment about the government's argument in that regard. Government, in order to justify the argument that the judge did employ a Crowley analysis, first concedes, as did the Court, that there had been adequate evidence of vigorousness in the relevant positions encumbered by my client to meet the most significant piece of the puzzle under Crowley. That is to say, the principal analysis as regards the basic reason for the position being either LEO or not LEO. Secondly, then, Crowley directs us, if the vigorousness test has been met, which I think clearly, under the facts of this case, it has been, we look to the hazardousness question and therein lies the heart of the dispute between the parties. That is to say, there was more than adequate evidence of hazardousness in the context of frequent contact with persons suspected or convicted of… That's not the point. We're really talking about substantial evidence here. Whether there was some reasonable amount of evidence that it wasn't hazardous. I understand. There can be substantial evidence on both sides, as long as there's substantial evidence on the side of the board. I should go home. That's right. We'll give you another few minutes. Thank you. I appreciate that. My point is that a failure to follow Crowley is to make a decision inconsistent with controlling law. So that not only is there an evidentiary question… Crowley wasn't riding on a clean slate. There are a lot of cases for Crowley. So we can't cabin hazardousness and push it off to the side. No, no. I don't think we should push it off to the side at all. Quite the contrary. I think Crowley served to refine that history of cases that goes back 20 years, dealing with this whole question of the nature of the duties performed, and arising from the legislative history of this very benefit. The degree to which we need young and vigorous people doing the job, and as a result of that, whether they're capable of performing those duties. In what respect do you contend that the board's decision was inconsistent with Crowley? In the context of the second and what I read Crowley to say less significant analytical test, the hazardousness component. My client prepared a substantial document reflecting his direct contact with a person suspected or convicted of filing federal criminal laws. It was a balance exhibit M at Erie. That document, and in particular with regard to his third assignment at Eisenbeck National Wildlife Refuge, details with specificity the contacts that he had while assigned at Eisenbeck, as well as the prior assignments. The actual documents, hard copy documents, forming the basis for that summary, were available and reviewed by the parties, or available to the parties for review. That's the part that Judge missed in the context of hazardousness. Why do you say that's the part that Judge missed? He missed because that didn't seem to satisfy his search for frequent direct contact with a person suspected or convicted. Well, but that's a different question of whether he applied the proper legal test to that. I mean, we could disagree with his assessment of the evidence, but your challenge is to the application of the correct standard. It is. And my question to you is, what is it that suggests that the administrative judge did not apply the correct standard? You can disagree with the conclusions reached, but the question is to Stan. He didn't apply the correct standard in the sense that he didn't make any analysis under the vigorousness, other than to leave it alone in the decision. There was no addressing the vigorousness element to begin with. But the government conceded that point. I mean, you know, so what difference does it make whether he applied the correct standard or not? The government said, yeah, the vigorousness standard is satisfied. Well, and my point, I guess, is that I don't think he applied the hazardousness appropriately in the context of this case. And I say that based on the evidence that was produced, and it takes us back to the substantial evidence question. Well, if we were to conclude that he did apply the correct standard, why isn't the evidence substantial evidence? At that point, that's exactly right. It does become a substantial evidence question. But why isn't there substantial evidence to support the decision if we find that the correct standard was applied? Because virtually all of the evidence on that question was to the contrary. That is to say, rather than frequent direct contact with persons suspected or convicted of violating the federal criminal law, the judge took the position that Exhibit M, and the context of that reflected, was simply guarding against or protecting life and property, excluded activities under the LEO regulation. That's the heart of that particular one. He did go on to make the kinds of findings that are also suggested by Crowley as appropriate for hazardousness. 24-hour on-call duty, authorized to carry a weapon, and did so. Fitness standards in place, and he complied with it, things of that sort. So it's really the contact question that's central, I think, to whether he applied the right standard or whether we have adequate evidence, sufficient evidence for the finding he made. Let me move quickly to the question of the evidentiary determinations made in this case. And first among those is the standardized approved position descriptions set out as accounts here in Exhibit C, which reflect what the government, and by that I mean the Department of Interior in this case, believes to be the activities of a qualified law enforcement officer. The Board, as the Court appreciates, took the position that because those were approved in 1994, I believe, they weren't relevant to service prior to that point in time. I suggest the contrary view is the better analysis. That is to say, if these documents, these standardized approved position descriptions, reflect what the Department of Interior, the deciding entity, believes a qualifying law enforcement officer does in the course of performing his or her duties, what better yardstick by which to measure the duties performed by Mr. Nunn than that document? And that was exactly the inquiry made of Mr. Nunn's supervisors at hearing. Taking the position description that was available at the time he performed the duties, and I point often to the GS-5 position description that required filling in blanks and hadn't even been filled in in this case. Taking that position description on the one hand, the approved, more specific, LEO position description on the other, the question was which better describes the duties Mr. Nunn actually performed? And the answer, not surprisingly, was the standardized approved position description. It is a piece of probative evidence, supportive of the proposition that my client was actually performing the kinds of duties that Congress contemplated people like Mr. Nunn should receive for their retirement. These are the C-1 and C-4 exhibits? They are. But the administrative judge excluded those because they were created after the period in question, right? He found them to be irrelevant. That's right, Judge. Do you disagree that they were created after the period in question? I do not. Then why are they relevant? I'm sorry? Why are they relevant if they post-dated the period we're talking about? Because they are the definition of what the employing agency looks for from a qualified law enforcement officer in the field, and I suggest there's no better analytical yardstick for assessing Mr. Nunn's duties than that document which they've created. They've said here is what we believe a qualifying law enforcement officer does, much in the same way perhaps there might be a regulation change. Here's what we now believe. Or there might be a change in analytical models such as Watson. Now we think we should look at position descriptions rather than actual duties. Those are all applicable to an assessment of prior service. That's why I think he was wrong in finding that set of approved position descriptions to be irrelevant. Equally, the same circumstance arose with regard to the OPM classification standards. The standards from 1958, almost 20 years prior to Mr. Nunn's service, were the ones he employed rather than the ones from 1990 immediately after. As Watson made clear, and this court certainly approved, the issue is not the reason for the creation of the job in 1958 or 1948. The question is the reason for the existence of the job. And as with the standardized position descriptions, so too developing and improved classification standards are not irrelevant. I suggest they have a role in the analysis. The easiest way to corroborate that is the court's comment in Crowley to the effect that position descriptions aren't always accurate. And that's not a matter of fault or malice. That's a matter of managerial efficiency, keeping up with the documents at hand. That's why the documents that we offer, about which I've just been talking, I believe are relevant. I believe the judge made a mistake in not considering them in the context of the decision he made. And for that reason, the case should be reversed. With that, and subject to questions, I'll reserve my remaining time. Fine. Ms. Moore. May it please the Court, we respectfully request that the Court affirm the decision of the Merit Systems Protection Board. The Board correctly held that Mr. Nunn did not hold law enforcement officer positions during the time periods at issue and denied his claim for an enhanced annuity. The Board's determination that Mr. Nunn did not prove by a preponderance of the evidence that his positions existed primarily for the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States is supported by substantial evidence. For the refugee manager positions at issue, the Board applied the position-oriented approach approved by this Court in the Watson case. The reasons for the existence of the position and the Board also considered all available evidence. The evidence that the Board considered were the classification descriptions, Mr. Nunn's position descriptions, the annual reports of each location where he worked for the time periods at issue, hearing testimony by Mr. Nunn and his supervisor, as well as Mr. Nunn's own description of his job duties on his Standard Form 171 when applying for his position in Alaska. Mr. Nunn's position at the Sequoia National Park existed primarily for the protection and preservation of fish, birds, and wildlife species in their habitat, and in some instances, the care and protection of certain historic or unique sites. Again, the Board considered all available evidence, OPM classification standards, refugee manuals, position descriptions, annual reports, and Mr. Nunn's own description of his duties at hearing testimony and in his SF-171. For the Laguna National Wildlife Refuge, the evidence again shows that Mr. Nunn's primary duties were maintaining law and order, the protection of life and property, and guarding against or inspecting for violations of law. The Izembek National Wildlife Refuge, the testimony by Mr. Nunn's supervisor was that Mr. Nunn's primary duties included the management of special use permits issued to guides, trappers, and other commercial entities. He was responsible for explaining the terms of the permits to the recipients and ensuring that they did not exceed the activities authorized by the permits. Mr. Nunn described his own duties at Izembek as including bear hunts on the refuge and the law enforcement challenges related to them. The most common type of law enforcement work was violations related to waterfowl. As Mr. Nunn described, his primary duties were the protection, maintaining law and order of the fish and wildlife species on the refuge. OPM has issued regulations stating that an employee whose primary duties involve maintaining law and order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States. Now, Mr. Nunn did apprehend some individuals during his time at these refuges. That is not disputed. However, those were not his primary duties. Both the statute, congressional statute, as well as the OPM regulation, as well as this court, require that they must be his primary duties. Why doesn't maintaining law and order constitute dangerous activities? Why does that not meet the definition of hazardousness, Your Honor? This court held in the Crowley decision that hazardousness must require the frequent and direct contact with criminal suspects. It must require that more than 50%— In other words, maintaining law and order deals mostly with non-criminals. That's true, Your Honor. And maintaining law and order, maybe that is, in a broad sense, law enforcement. But for purposes of an enhanced annuity, law enforcement officer means a subset of that broader definition of law enforcement. And he does not meet the subset definition, which is more than 50% of his time must have been apprehending, detaining, investigating persons suspected of violating criminal laws of the United States. And that was not the case. Even Mr. Nunn, in his own description of his jobs, on page 28 of the government's appendix, he, in his own words, describes the duties in his positions at Laguna and Sequoia National Parks or National Wildlife Refuges. And I'd like to read his own descriptions into the record, because that perhaps is the best evidence of what he did primarily in these jobs. For his job at Laguna, he stated, assist project leader in planning, organizing, and administering highly complex refuge program. Am responsible for the execution of full refuge management program. Plan and direct daily activities of six employees, GS5 through 7, in wage grades 6 through 10. Prepare PBBE reports. Conduct cooperative farming and grazing program. Determine crops to be planted, areas to be grazed. Issuing permits. Preparing agreements and conduct compliance checks. Meeting with farmers and grazers on a frequent basis. Provide supervision with detailed work project descriptions and work schedules of subordinates for the purpose of annual planning and program scheduling. That was his own description of his duties at Laguna. His own description of his duties at Sequoia were as follows. Conduct weekly waterfowl census. Prepare public use, monthly waterfowl, monthly activities, and other reports. Assist in planning, administering, and executing farming, grazing, hunting, and public use programs. 23 cooperative farmers were met with on a frequent basis. Conduct law enforcement patrols independently. At times, supervise two employees, wage grades 6 and 8, and two YACC enrollees. I think we have the points, Ms. Moore. Oh. And of course, that's in the brief. Yes, Your Honor. Ms. Moore? Yes. Are you familiar with the Farrier case? The Farrier case? The board's Farrier decision. Aren't the facts there very close to the facts here? Your Honor, Mr. Nunn undisputedly did conduct patrols, as did Mr. Farrier, as did Mr. Cox before the MSPB and affirmed by this court, as did Mr. Fennegrin, as well as Watson, and the Koenig case. They all undisputedly conducted patrols. In the Fennegrin case, Mr. Fennegrin actually issued citations and fines to poachers. That's a violation of criminal law. It doesn't meet the primary test. In other words, not more than 50% of their work was apprehending and investigating, detaining these individuals. But you could say the same for the facts in the Farrier case, couldn't you? The facts? I'm not sure of the percentage of Farrier, Your Honor. Maybe that case was not correctly decided. Well, this court's recent decisions, Your Honor, Crowley, Bingaman, Watson, make it very clear. I mean, Crowley, which Petitioner relies upon exclusively, makes it clear that consistent, frequent contract with criminal suspects must be 50% or more of the individual's time. Here, looking at all the evidence, there is no way that Mr. Nunn can show that the board erred by holding that substantive. He did not prove by reconnaissance of the evidence that his time was spent more than 50% in apprehending such individuals. Regarding the position description of 1994 that Mr. Nunn would like to have retroactively applied to him, that is for a different job description, a different job position. It is for a park ranger. Now, again, many of the court's cases do involve park rangers. However, the description of the duties is not the same as his description of his duties back in 1977 through 1983. There are different classification standards. And, again, that position description says that the individuals to obtain LEO status must spend more than 50% of their time on those duties. So there's a caveat. Those position descriptions are not a blanket assurance that the individual holding them will attain LEO status for an annuity. It must be, again, meet the 50% or more primary test. And, surely, the best evidence here as to whether Mr. Nunn engaged in those duties primarily are the contemporaneous documents. Thank you. Thank you, Mr. Moore. James has a few minutes to rebut. Two observations. It is undisputed in this case that Mr. Nunn performed law enforcement duties 50% or more of the time in the three positions at issue here, the three facilities at issue. That was the testimony of his supervisors. Why do you say it's undisputed? We just heard it's disputed. In the context of the evidence, there is nothing that the government can point to that said he only did 12% of his time or some other quantifiable number. And as the Court appreciates, OPM set up this analytical model whereby anyone who performs qualifying law enforcement duties 50% of the time or more is presumptively entitled to benefit. What the AHA said was that this testimony was using the wrong definition of law enforcement. It was treating him as though he was engaged in law enforcement whenever he was on patrol, right? That was the other comment I wanted to make. That's exactly right. And if you look at Exhibit M, again, contained in the appendix, what you will find is—and I draw your attention particularly to the third assignment because that's where there was the best evidence available of the actual duties he was performing. You'll find the source of the lead, if you will, that led to the investigation and apprehension of citation by Mr. Nunn. Much of that criminal investigative and apprehending activity came first from patrol. I know the government in this and other cases would like patrol to be a synonym for guarding against or protecting life and property. Mr. Nunn clearly and definitively explained the distinction between walking a perimeter to guard property and affirmatively being on law enforcement patrol for the purpose of seeking out and dealing with persons suspected of violating or actually violating federal criminal laws. That is the evidence that's there. The patrolling is an affirmative act. It is not a passive stay at home and rattle doors, if you will, to make sure they're all locked and secure. That's the distinction in this case. That's why there was more than 50 percent of the time. That's why that time was spent in the field because you can't be on affirmative law enforcement patrol if you're not in the field. That's why the supervisors got to where they got. I have 18 seconds. I'd be happy to entertain any questions. Thank you. Thank you.